IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHARAN RENE BOUDREAU, | § | |
| | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| | § | |
| NOKIA CORPORATION (NOKIA OY), | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE OF SAID COURT:

Sharan Rene Boudreau ("Plaintiff or Boudreau"), Plaintiff, files this Original Complaint and Jury Demand against Nokia Corporation (Nokia Oy) ("Nokia" or "Defendant") and would show the following:

**I.  PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Sharan Rene Boudreau is a 56 year old female citizen of the United States of America.

2.      Nokia is a  Finnish multinational telecommunications, information technology, and consumer electronics company, founded in 1865. Nokia's headquarters are in Espoo, in the greater Helsinki metropolitan area.  In 2018, Nokia employed approximately 103,000 people across over 100 countries, did business in more than 130 countries, and reported annual revenues of around €23  billion. Nokia  is  a public  limited  company listed  on  the Helsinki  Stock

Exchange and New York Stock Exchange. It is the world's 415th-largest company measured by 2016 revenues according to the *Fortune Global 500,* having peaked at 85th place in 2009.[4] It is a component of the Euro Stoxx 50 stock market index. Nokia does business in the state of Texas and within the Northern District of Texas.  Nokia resides within the Northern District of Texas within the meaning of 28 U.S.C. § 1391 (c) (2) and (d).  Nokia may be served via its registered agent for service and local operating unit, Nokia of America Corporation, Registered Agent - Prentice Hall Corporation System, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218 and may be served by Service upon Secretary of State for mailing to 1614 Sidney Baker Street, Kerrville, Texas 78028-2640.

3.     This court has jurisdiction to hear the merits of Plaintiff's claims under 28 U.S.C. § 1331 and §1343 and 29 U.S.C. § 621 *et seq.*, in order to protect rights guaranteed by the Age Discrimination in Employment Act of 1967, as amended ("ADEA"), and Tex. Labor Code §21.001 *et. seq.,* The Texas Commission on Human Rights Act, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* in order to protect rights against sex discrimination and retaliation.

4.     Venue exists in this district and division under 28 U.S.C. § 1391.

5.     Defendant resides in the State of Texas and within the Northern District of Texas within the meaning of 28 U.S.C. § 1391 (b)(1), (c)(2) and (d).

## II.  FACTUAL BACKGROUND

6.     Boudreau began her employment with Defendant on August 9, 2004.  Boudreau's initial position was Corporate Counsel.  When she started with Nokia, the company she went to work for was called Alcatel USA Marketing Inc.  This was or became part of Alcatel-Lucent USA Inc.  On or about January 6, 2016, Nokia acquired Alcatel-Lucent USA Inc.  Boudreau's

2017 W-2 was from Alcatel-Lucent USA Inc.   Alcatel-Lucent USA Inc. became Nokia of America Corporation on January 1, 2018.

7.      In February 2016, **Maria Varsellona ("Varsellona")**, Chief Legal Officer of Nokia, presented Boudreau with an award – the Legal & Compliance Excellence Award as a Change Agent (1 of 17): "Change Agents Team - supporting the organization globally on the post- closing process and transactional issues."

8.      Near the end of 2016, Varsellona presented Boudreau another award – the Legal & Compliance Celebrate Excellence Award, an annual award recognizing her contributions during 2016.  Boudreau's boss/line manager (until 8/1/18) **Esa Niinimaki ("Niinimaki")**, Vice President, General Counsel Global Services, told Boudreau that getting the award was especially noteworthy because he did not put Boudreau in for the award.  Niinimaki told Boudreau "the recommendation for the award came from CO L&C."  This means that the recommendation for the 2016 award came from Boudreau's bosses' peer – **Nassib Abou-Khalil)  ("Abou-Khalil** -- because Abou-Khalil was the CO L&C head globally and would have been the CO L&C representative at that meeting.  Niinimaki also said there was not any debate or disagreement of any kind about Boudreau receiving this award, though there had been disagreement about some of the other awardees.

9.      On April 18, 2017, Boudreau received an email from Abou-Khalil asking if she had a minute for a quick chat. They planned a call for an hour and a half later.  During the call, Abou-Khalil said that **Genevieve Silveroli ("Ms. Silveroli")** (then head of Customer Operations Legal & Compliance (CO L&C) for the North American Region (NAM)) was leaving. Abou-Khalil said I should not talk to Ms. Silveroli unless Ms. Silveroli specifically mentioned her leaving to Boudreau.  Abou-Khalil did not say why Ms. Silveroli was leaving, but indicated that

he was very concerned that the fact she was leaving was extremely confidential. Based on Boudreau's discussions with Ms. Silveroli, Boudreau suspected that Ms. Silveroli had complaints about some kind of gender discrimination based on the way that Abou-Khalil had been treating her. Abou-Khalil said he was looking for someone to assume Ms. Silveroli's role while he found a replacement and that he was considering Boudreau and another attorney for the temporary role. Abou-Khalil asked if Boudreau was willing to help. Boudreau responded that she would be glad to help. Abou-Khalil said that he would arrange for Boudreau to have a call with **Ricky Corker ("Corker")** (EVP & President of North America -- the head of Customer Operations for NAM) and that he would take Corker's opinion into consideration.

10. Abou-Khalil told Boudreau that she could apply for Ms. Silveroli's position when it became open. Boudreau told him that she would need to think about it before making a final decision, but that she was interested in the role. Boudreau started to say something about her experience and her "fit" for the role when Abou-Khalil interrupted her and said that she should not think that she would automatically get the role, that he was going to go through a complete interview process and would consider both internal and external candidates. Boudreau responded that she would never expect to be given a role without going through the normal process, but that she believed that if she did decide to apply and if he did select her, he would be happy with her work based on her experience with other people that she had worked for. Boudreau ended by saying that, no matter what happened, she would be happy to help in any way she could. Abou-Khalil said he had to go and would arrange for Boudreau to have the call with Mr. Corker.

11. On April 20, 2017, Abou-Khalil copied Boudreau on an email asking Corker's assistant, Jody Thomann, to schedule a call between Boudreau and Corker. On April 21, 2017,

Corker and Boudreau spoke for a few minutes.  Corker did not have many questions and said he would defer to Abou-Khalil.  Boudreau assured Corker that she would be present to help in any way she could.

12.     On April 25, 2017, Abou-Khalil contacted Boudreau again.  He told Boudreau that he had decided to go with the other attorney instead of her.  The other attorney was a male, who was significantly younger than Boudreau.  Abou-Khalil chose a male employee, Juan Pablo Guzman ("Guzman"), the head of CO L&C for Latin America (LAT).  Guzman graduated with his JD in Columbia in 1991.  Boudreau believed at the time that Guzman was around 47 years old (estimated on Columbian practice of providing 11 years of school starting at age 5 and assuming Guzman started college immediately).  For a long time, Guzman and Boudreau had many conversations and Guzman was treating Boudreau as the likely successor to Ms. Silveroli's position.

13.     On or about May 3 or 4, 2017, Abou-Khalil came into town with Guzman to meet with Ms. Silveroli's former direct reports, to introduce Guzman, and to meet with an outside firm.  Abou-Khalil asked Boudreau to meet with him while he was in town and then to join him and Guzman at a lunch with the outside firm.  They rode together to the lunch meeting.  Abou-Khalil asked Boudreau to help pick a place for the lunch and then asked her to help plan a last-minute farewell party for Ms. Silveroli with flowers.  Boudreau did both. The discussions were about the work that Boudreau was doing.  Abou-Khalil "encouraged" Boudreau to apply for the position that Ms. Silveroli had occupied by asking if she was planning to apply for the opening created by Ms. Silveroli.  She said yes.  He reminded her that she should not assume she would get the job just because she applied.  Abou-Khalil said he would be considering internal and external candidates and he would choose the best candidate for the position.  Boudreau asked

Abou-Khalil about additional compensation with the role.  Abou-Khalil said he did not know if there would be any additional compensation in Boudreau's situation because he did not know anything about her compensation.   Boudreau said something about expecting some additional compensation if she took on more responsibility. Abou-Khalil did not disagree or comment. Abou-Khalil said he would be considering input from many people, but the final decision was his decision to make.

14.     On May 16, 2017, Boudreau had this electronic conversation with Abou-Khalil:

Sharan:  Greetings Nassib!  I hope all is well with you.  I looked for the job posting and couldn't find it.  Has it been posted yet?

Abou-Khalil: Hey Sharan, Nooooo    hr is late posting it … should happen soon…

Sharan:  Administrivia can be such a pain.

Abou-Khalil:  Yep

Sharan: The team seems to be hanging in.  Missing Gen, but marching on.

Abou-Khalil: Good

       Happy to hear that

       Thank you for keeping an eye on them

Sharan: You're welcome. It's easy and natural for me.  No matter what happens, I know and care about all of them.  I hope you have a good night!

Abou-Khalil: Thanks so much

Landing in Rio

15.     On May 17, 2017, Boudreau updated her resume.  On May 18, 2017, Boudreau **applied for the position – Head of CO L&C for NAM.**

16.     On May 22, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, just to keep you updated.  We have not started interviews for the role yet.  We should be starting sometime week of June 5. I will keep you posted. Thanks, Nassib"

17. On June 7, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, Sorry for the short notice, Would you be available for an interview this Friday at 18:00 CET? Unfortunately I have very little availability before I go on vacation and I would like to interview you before I take time off. Please let me know ASAP. Nassib" Boudreau responded: "Hi Nassib, No worries. Friday at 18:00 CET works for me. Best regards, Sharan."

18. On June 8, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, Would you have a CV that you can send me to share with the HR team sitting on the interview with me? Nassib." Boudreau sent him the resume. Each of the interviews were with a panel of interviewers. There was an interview with Abou-Khalil and HR, one with senior L&C attorneys, and one with Corker. Nassib made it clear that he was taking input from many people, but the decision was his decision.

19. On June 9, 2017, Boudreau had a WebEx video interview with Abou-Khalil, and two HR representatives -- Outi Tuomaala and Poitr Rychel. The interviews were behavioral questions (e.g., "Describe a stressful situation at work and how you handled it."). Everyone seemed satisfied and positive. The interviews were broad ranging in scope and included questions regarding Boudreau's experience as a commercial attorney and her experience managing people and teams, but that was not the primary focus of the questions. When asked why Boudreau thought she would do well managing this team, she responded that she knew almost everyone who would be working with her and had worked well with most of them in the past, that she knew their strengths and weaknesses, and that she would draw on her previous experiences managing people and teams. No one indicated any concern about any lack of management experience on Boudreau's part. After the interview, Boudreau sent everyone an email stating: "Hi Nassib, Outi, and Poitr, Thank you for taking the time to meet with me today.

I appreciate your time and attention.  If you have any lingering questions, please don't hesitate to call or email me.  Have a great weekend and, Nassib have a fantastic vacation! Best regards, Sharan."  Piotr responded saying: "Hi, Nice meeting you as well Sharan.  Great weekend to all."  Abou-Khalil responded saying: "Thank you very much Sharan and have a fantastic week end!"

20.     On July 5, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, I hope that you are doing well.  I am sorry that you have not heard from me in a while.  Just a quick note to let you know that we are now ready to schedule the second round of interviews and Sharon on copy will be in touch to schedule your interview, it will most likely be with Alex Mendoza and Riika Tieaho.  Best, Nassib."  Boudreau responded: "Thank you for your message. I will keep an eye out for the invitation.  Best regards, Sharan."

21.     On July 10, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, Thank you very much for making yourself available during your holidays.  This is really much appreciated.  I wanted to let you know that the interviewers today will be Alex Mendoza, Riika Tieaho and JL Khayat.  Best of luck! Nassib."  Boudreau participated in the WebEx video interview with Alex, Riika and JL, all of whom she had had positive interactions with in the past. They seemed to be very satisfied with Boudreau's responses.  In fact, the call ended a few minutes early.  Again, the questions were broad ranging in scope and included questions regarding Boudreau's experience as a commercial attorney and her experience managing people and teams, but that was not the primary focus of the questions.  When asked why Boudreau thought she would do well managing this team, she responded that she knew almost everyone who would be working with her and had worked well with most of them in the past, that  she knew their strengths and weaknesses, and that she would draw on her previous experiences

managing people and teams.  No one indicated any concern about any lack of management experience on Boudreau's part.

22.     On July 11, 2017, Boudreau sent Abou-Khalil a message stating:  "Hi Nassib, I enjoyed my time with Alex, Riika, and JL.  I didn't ask them about next steps because I felt that question was best directed to you.  What do you see as the next step? Thanks, Sharan."

23.     On July 18, 2017, Mr. Abou-Khalil sent Boudreau a message stating: "Hi Sharan, I am sorry for responding just now.  I am glad that you had a good conversation with Alex, Riika and JL.  I am hoping that we will finish all second rounds this week and then the next step would be a discussion with Ricky [Corker] and maybe also Maria [Varsellona].  I will keep you posted.  Thanks so much for your patience.  Nassib."  The reference by Abou-Khalil to "Maria" is to Ms. Maria Varsellona, the Chief Legal Officer of Nokia.

24.     On July 24, 2017, Abou-Khalil sent Boudreau  a message stating: "Hi Sharan, Just a heads up that you might get invite for an interview with Ricky tomorrow.  Nassib."

25.     On July 25, 2017, Abou-Khalil sent Boudreau a message stating: "Hi Sharan, would you mind spending (sic) your CV directly to Jody?  I am unable to send attachments right now.  Thanks so much! Nassib."  Boudreau sent Jody (Corker's assistant) her resume and met with Corker in person. Boudreau's conversation with Corker went very well.  They talked longer than expected and Corker's body language indicated enthusiasm as he said he was going to go and call Abou-Khalil right away.  Again, the questions were broad ranging in scope and included questions regarding Boudreau's experience as a commercial attorney and her experience managing people and teams, but that was not the primary focus of the questions.  When asked why Boudreau thought she would do well managing this team, she responded that she knew almost everyone who would be working with her and had worked well with most of them in the

past, that she knew their strengths and weaknesses, and that she would draw on her previous experiences managing people and teams.  Corker did not indicate any concern about any lack of management experience on Boudreau's part. To the contrary, he seemed genuinely enthusiastic about Boudreau's experience working with the business in his region and told Boudreau that he was going to call Abou-Khalil right away.  All indicators were that Corker would be happy to be working with Boudreau and that she would be promoted.

26.     On August 22, 2017, Abou-Khalil called and said:

- we haven't closed the requisition;

- **we have another candidate for the position**;

- **you weren't selected for the position**;

- **the reason for the decision not to hire you primarily was lack of management experience**;

- everyone was very impressed with your acumen and your commercial knowledge and familiarity with the market;

- all of the feedback was very positive;

- not hiring you even if the other candidate doesn't accept the offer; and

- you're a highly valued member of the team.

Boudreau responded by saying that it may not have come across clearly, but she did have significant management experience, including when she was the Lead Counsel for the Services Business Group at Alcatel after the merger between Alcatel and Lucent and had 6 people reporting to her.  That was for about 18 months until Alcatel-Lucent had a major re-organization that eliminated that role.  Also, Boudreau stated that when she was responsible for the verticals market in North America for about 8 years, she indirectly managed 3 contract managers and was involved in hiring and firing decisions and training.  She told Abou-Khalil that when she was at

Weil, Gotshal & Manges LLP, she managed several large cases, including one that had about 100 contract attorneys and paralegals where she was the person primarily responsible the hiring, firing, and day to day management.

Abou-Khalil said he did know about that information but that Boudreau's responses to the questions during the interviews didn't show the kind of experience he was looking for, that "everyone" was concerned that Boudreau might not have enough management experience.

Abou-Khalil's comment about "everyone" being concerned was inconsistent with facts and, based on the treatment of other male employees of the Nokia legal department, indicated that the rationale he gave was not consistent with Nokia's actions in the recent past. For example, a male Nokia/Alcatel employee, Alex Mendoza went from having no one reporting to him and having no management experience to being a business group head at the N-2 level (reporting directly to the Chief Legal Officer) with multiple direct reports. Another male employee who was a member of Boudreau's team (Kristian Grimes) and had absolutely no experience with management of people was hired for a position over the CO L&C for the United Kingdom in early 2017. Also, as his LinkedIn profile shows, Niinimaki (Boudreau's boss) went from a Senior Legal Counsel position with no direct reports to being the Head of NSN Corporate Legal, Head of Finance & Labor Legal, a position where he had direct reports. **All of these more favorably treated people were men**. Still, without knowing anything about the other candidate or whomever Abou-Khalil would ultimately hire, Boudreau did not know if he was being honest or dishonest in his comments and explanation regarding why he was not hiring Boudreau. She did not, at that point, have knowledge of age or gender discrimination against her with reference to the promotion, and she was not sure the promotion would not be hers in the end.

After this conversation with Abou-Khalil, Boudreau learned that the other candidate did not accept the position. Boudreau understood that the position was still open and that she might still get the position.  After all, Boudreau was getting more experience all the time and more exposure to Abou-Khalil, including teaming with Corker on a Compliance presentation in November 2017.  Boudreau had also talked to Niinimaki (Abou-Khalil's peer) and Boudreau hoped that he would speak with Abou-Khalil about Boudreau's experience and persuade him to reconsider.

27.     On or about August 23, 2017, shortly after talking with Abou-Khalil, Boudreau spoke to Niinimaki.  When Boudreau told him Abou-Khalil's comments, Niinimaki's first comment was "that's interesting, especially given how flat our organization is."  Niinimaki's comment indicated that he knew Abou-Khalil's explanation for not promoting Boudreau was not credible.  Niinimaki suggested that Boudreau could maybe lead teams in some way to demonstrate her leadership abilities. Boudreau responded that she did not know if that would matter to Abou-Khalil because she had led teams and actually had direct reports while working at Nokia (when it was Alcatel-Lucent) and Boudreau told Niinimaki about the other management experience with managing 3 contract managers (albeit indirectly) for about 8 years at Nokia/Alcatel-Lucent and being involved in hiring, firing, and training of those contract managers.  **Niinimaki said he knew Boudreau had a lot of management experience and would be great for the job.**  Niinimaki stated that he would hire Boudreau for the position if he could. He tried to say that Abou-Khalil might be reluctant to hire Boudreau after what happened with Ms. Silveroli.  Niinimaki seemed to imply he believed that Abou-Khalil did not have confidence in Ms. Silveroli because she was new to the role.  Boudreau could tell that  Niinimaki

did not know what else to say, that he was reaching for some kind of answer, because he knew the reason Abou-Khalil gave did not make sense.

28.     On September 18, 2017, Boudreau was notified that she had been recognized as one of the top 50 women lawyers in Dallas with this message:

Dear Carol,

> On behalf of the Texas Diversity Council, Sharan Boudreau from Nokia has been recognized to be awarded the "Dallas Top 50 Women Lawyers Award" during our 2017 Dallas Legal Diversity Week which is November 7th – 9th, 2017.   This award is designed to recognize women who have made a difference through their achievements and exemplify the ability to excel in the legal arena. There will be an awards breakfast on November 7th from 8:00am – 10:00am at the Sheraton Dallas Hotel. We will feature all awardees on top 50 website which is currently being updated.

> Please forward a high-resolution image (1000 x 750pixels), for us to post on the website and use for social media as well as your bio. I have attached a document with additional information regarding the Legal Diversity Week. Please let me know if you have additional questions.

29.     On November 7, 2017, Boudreau attended the Breakfast for the Dallas Top 50 Women Lawyers Award.

30.      In her annual review, Niinimaki wrote:

> In 2017, Sharan was again a true team player who cares about the business outcomes and Nokia's interest beyond the team and role boundaries. Sharan is a source of in-depth experience for example in adjacent markets like TEPS as well as commercial litigation that the rest L&C again benefitted from. Sharan was again active in sharing learnings and information from her projects as evidenced in the trainings & communications target. Sharan's close support to the 3PI projects continued to be vital for those projects and was praised by her stakeholders. While Sharan closed those deals she was involved in 2017, she suffered a bit from the fact that GS did not have any game changer deals in NAM in 2017. However, 2018 is likely to change that and give an opportunity for Sharan to shine in deals that are relevant for GS at the global level. To develop to the next level and to able to support more senior leaders, Sharan can still focus more on concise and well-structured communication describing very shortly the issue (the "so what"), key asks from each involved individuals and/or the suggested solution. Given her

workload, she can also benefit from more clarity on the key GS key priorities in SI and her markets to be able to more focus on those and become more visible to the whole GS.

31.     On or about January 23, 2018, Boudreau became heavily involved in major transaction negotiations that were heating up, escalating to full time activity through April 16, 2018.

32.     Until January 29, 2018, **Boudreau thought she still had a chance of being selected for the promotion she was seeking, the still-vacant position – Head of CO L&C for NAM.**   The longer time went on, the more Boudreau thought that Abou-Khalil would change his mind and offer her the position. Boudreau was not alone in this mindset; she had many coworkers, people who would be working for her in that role, calling her at various times asking if Abou-Khalil had reached out to her to offer her the job.

33.     On January 29, 2018, Abou-Khalil sent Boudreau a message stating:

Hi Sharan, I hope you are well.  I tried to reach you this morning without success.  I wanted to speak to you and personally let you know ahead of the announcement that the head of legal for NAM is starting this week.  I am at the San Antonio sales conference and the network is not good here.  I tried you on FaceTime.  Needless to say that I am really counting on your support Sharan to help him settle into this role as I consider you as one of the leaders in the NAM martket (sic).  Let's try and catch up soon. Nassib"

**This email told Boudreau (a) someone other than herself had been selected to fill the vacant Head of CO L&C for NAM position and (b) the person selected was a male.**

34.     Boudreau responded shortly thereafter:

Hi Nassib, Thank you for reaching out to me.  I was on the phone, but I don't have any missed calls.  I look forward to hearing more about the new CO lead for NAM. Please let me know when you might have time to talk.  I am available after 2:00 p.m. CT.  Best regards, Sharan"

Abou-Khalil responded: "Hi Sharon why don't you send me a webex invite for 14:15 for 15 min and I would introduce you?"  Boudreau scheduled the call.  Abou-Khalil and **Mr. Jody Bishop ("Bishop")** (the person hired from the outside for the vacant Head of CO L&C position) were in an office.  Abou-Khalil introduced Bishop. Boudreau could see Bishop as they talked.  Bishop could tell that he is significantly younger than she was.  Boudreau estimated that Bishop was about 45 years old – about 10 years younger than she.  Boudreau welcomed Bishop and asked him to tell her a little about himself.  Abou-Khalil introduced Boudreau as a valuable resource, someone who knows a lot about the business and especially about the TEPS business.  (TEPS stands for transportation enterprise and public safety. It is enterprise, state and local government customers).  Bishop said he had worked at Fulbright & Jaworski and then was the General Counsel at Genband.  Boudreau asked Bishop if he had any experience in state and local or enterprise agreements.  Bishop said he had managed commercial agreements and included some enterprise customers.  Bishop looked very uncomfortable when Boudreau asked him about his experience.

35.     Boudreau looked up Jody Bishop's LinkedIn page and noticed that he had a practice focusing on intellectual property and patent law for the majority of his career (a very narrow field of the law) and that he had been the General Counsel of Genband for only 2 years. It was obvious to Boudreau at this point that **Bishop was male and significantly younger than her, and she was far more qualified than Bishop for the position of Head of CO & L&C for North America.   This is how their qualifications compared:**

| MS. SHARAN BOUDREAU | MR. JODY BISHOP |
|---|---|
| <u>Undergrad degree</u>:  May 1991<br>Univ. of Houston;  B.A.  in  Political Science,  Minor  in  Economics,  *Summa Cum Laude* (Top 2%) | <u>Undergrad degree</u>:  1995<br>Univ. of Arkansas; B.S. in Computer Systems Engineering |

|  |  |
|---|---|
| Top 10 law school (Duke)<br>JD and Master of Laws 1995 *with High Honors* (top 10%)<br>Master of Laws in International and Comparative Law | Much lower tiered law school:<br>JD degree 1998<br>Univ. of Arkansas (no honors) |
| Academic Honors:<br>Honor Societies:  Phi Kappa Phi, Pi Sigma Alpha, Alpha Lambda Delta, Phi Eta Sigma.<br>Social Science Scholars (Scholar of the Year 1988-1989, Vice President 1989-1990, President 1990-1991).<br>Dean's List Every Semester Undergrad Award for Honors Thesis | Academic Honors:<br>None. |
| Associate – Shaw & Associates<br>5/95 to 5/97 | Briefing Clerk – Lisle Law Firm 1997-98 |
| Associate – Brown McCarroll & Oaks Hartline – 5/97 to 6/98 | Associate and Partner at Fulbright & Jaworski, Sept. 1998 to Feb. 2012 |
| Senior Associate – Weil, Gotshal & Manges – 6/98 to 7/2004 | Associate General Counsel – Intellectual Property – Genband 2/12 to 10/15 |
| 8/2004 to Present<br>Corporate Counsel – Head of Litigation – Alcatel North America;<br>Corporate Counsel – Lead Counsel, Services Business Group, Global – Alcatel;<br>Corporate Counsel – Strategic Industries and Enterprises, North America – Alcatel;<br>Senior Corporate Counsel – Channels and Alliances, North America – Alcatel;<br>Director, Lead Counsel for Global Services, Mobile Networks, and Managed Services in the Americas and Systems Integration Globally | Sr. Vice President, Director of Legal at Genband 10/15 to 12/17 |

36.     On April 13, 2018, Boudreau had a 1-in-90 (a one-on-one meeting) with her boss, Esa Niinimaki.  During this meeting, Niinimaki gave Boudreau her annual review.  Niinimaki said:  "85% of the law department got "meets or exceeds" [a 3].  You're a true team player. Thank you for responding to the feedback from Jim Cocito to show him what you're doing for

him.  His feedback on that was good.  Now, we need to talk about development.  At the end of the last 1-in-90, you asked about opportunities for growth and development in light of the fact you didn't get the CO L&C position.  You've done a great job supporting Jody in his new position.  It's funny but Nassib contacted Boudreau a while back about you and Jody.  He said you were asking a lot of questions about Jody's qualifications and experience and had been going onto LinkedIn every day, and **he questioned whether you would support Jody the way you should**."

When Boudreau was silent, Niinimaki said: "This is where you're supposed to laugh."

Boudreau didn't laugh.

Niinimaki pressed on saying: "It is absurd for Nassib to question your support because, in fact, I know you made it a point to introduce Jody to people and invite him to Jim's meeting.  I didn't take him seriously at the time, but I want you to know that going forward I am going to take him more seriously in the future … so he doesn't go around telling other people things like this."

From Niinimaki's tone and the context of his statements, Boudreau firmly believed that Abou-Khalil spoke to others about his concerns about her performance, which is what prompted Niinimaki to say he would be more careful in the future.  Niinimaki went on to say: "I do want you to make sure you join Jody's meetings and give him support like you did Gen."

Boudreau told Niinimaki that she had been and would continue to do so.  Boudreau mentioned that there were two conflicting meetings coming up next week.  One of them was Jim Cocito's face to face meeting (a very important client meeting that takes place a couple times a year, a meeting that had consistently been prioritized over other meetings, including meetings with L&C members, because of its importance to the clients) and the other meeting was Bishop's meeting with his team. Abou-Khalil was going to be there.

Niinimaki said: "You should make it a point to join as much of Jody's meetings as possible, make it a priority over Jim's meeting. It's really important for you to be there, especially in light of Nassib's concerns about you supporting Jody."

In the conversation, Niinimaki mentioned the need to continue to give support to CO L&C because they were so short staffed.

This conversation indicated Boudreau's role as an equal to Bishop was being diminished and that Boudreau was likely to be demoted.  Not only was Boudreau told to change priorities and make Bishop's meeting the higher priority, but the people joining Bishop's meeting were his direct and indirect reports together with Abou-Khalil, his boss.

Later that day,  Boudreau talked with Ruth Foster, the business group lawyer for Fixed Networks (one of Boudreau's peers).   Ms. Foster was previously a level N-3 like Boudreau. Foster started supporting CO L&C and then was demoted to N-4 and was now reporting to Bishop.  Foster told Boudreau that she and Tom O'Hara (another business group attorney and peer of Boudreau's) were both now reporting to Bishop and were both N-4.  These facts, together with the other comments from Niinimaki, indicated that Boudreau was headed on the same or similar path as Foster and O'Hara and that, eventually, Boudreau would be working for Bishop under Abou-Khalil – the same person who just went to Boudreau's boss (Niinimaki) to question Boudreau's character and criticize her based on the fact Boudreau was asking questions about Bishop's qualifications.   These facts indicated to Boudreau that Abou-Khalil perceived her questions as Bishop's qualifications as a complaint that she had been denied promotion to the job for which Nokia hired Bishop due to her sex and age.

The discussion with Niinimaki coupled with learning that Nokia had given the Head of CO L&C for NAM position I had hoped to be awarded to a much less qualified, much younger,

new-hire male employee was crushing to Boudreau.  She felt devastated, powerless, defeated, used, and broken.  Somehow, Boudreau managed to work with the team to finalize the negotiations on a major transaction.

37.     On April 16, 2018 the major transaction negotiations concluded.  This lessened Boudreau's workload long enough for her to come up for air and think about what was going on. Crushed and broken by obvious illegal discrimination and retaliation for asking questions in a way that Abou-Khalil treated as a complaint of sex and age discrimination , Boudreau worked shorter hours, instead of going to the office because she could not make herself go.  Boudreau told people she was sick because she could not focus and she could not move, so she did not go to any meetings.  Boudreau could not face anyone.  She sought help from doctors and made plans to talk with Human Resources ("HR").  Boudreau spoke with HR who said they would get back with her by the end of the week.  Boudreau spoke with Julie Liptak (VP for HR Americas). Liptak was at their lake house and seemed somewhat distracted by a neighbor with Alzheimer's who was staying at her house.  Liptak and Boudreau discussed Boudreau's non-selection for the promotion, the damaging negative comments from Abou-Khalil and the position Boudreau was being put in by Niinimaki who did not seem to see the significance of what Abou-Khalil said. Liptak said she would look into it and said she would schedule a time on Friday.

38.     As of April 17, 2018 numerous emails were circulating with very complimentary remarks thanking Boudreau and the team for our work on the transaction negotiations and praising the deal Boudreau and the negotiating team had accomplished.  These are a few examples:

Mr. Niinimaki:  "Congratulations,  Sharan and David. This deal is a real game-changer for us. . .

Mr. Abou-Khalil: "[Other company] WING Great Job everyone, well done!"

Bobby Fanelli: "Congratulations to all! It has been a long and challenging road, but we did it. I can't say enough about this team. . . . THANK YOU, WELL DONE team, and I look forward to continuing our work together with [other company]."

39.     On April 18, 2018 Boudreau notified Bishop that she would not be joining his dinner or meetings because she was sick.  Someone told Boudreau that Abou-Khalil announced to everyone at the meeting that Boudreau would not be there because she was ill.  This was an odd announcement, because Boudreau would not normally be expected to join the meeting and if there was an announcement, it would normally have come from Bishop, as the person who was conducting the meeting and the person Boudreau had contacted.  Several of Boudreau's friends reached out to her because Abou-Khalil saying she was ill seemed so weird and escalated their concern.

40.     On Friday, April 20, 2018, Boudreau spoke with Liptak again.  She said she had done some digging.  She told Boudreau that she spoke with the HR person who participated in the interview process and that person said that Corker had agreed that the other candidate back in August of 2017 (the one who did not accept the position) was a better candidate.  Liptak's statement seemed out of place because the other candidate she mentioned did not take the job. Liptak said based on that fact and her discussions, they did not feel any action was necessary. Liptak and Nokia were treating Boudreau's expressed concerns and upset as complaints of age and sex discrimination about the decision to deny Boudreau the promotion and give it to Bishop. Liptak was trying to protect Nokia by telling Boudreau that she had somehow "investigated," and that there was no discrimination against her.   Then Liptak showed Boudreau the door. Liptak told Boudreau that  she could consider taking short term disability if she qualified.  Liptak recommended that Boudreau talk to Angie Nail (the HR head for disability), which she did.

In one of Boudreau's conversations with, Liptak was thinking out loud and said if Boudreau took this to her boss, would he talk to anyone about it? Her answer to her own question was no. After this conversation with Ms. Liptak, Boudreau provided notice that she needed to go on short term disability. Boudreau's notice to Niinimaki stated:

Hi Esa,

> For medical reasons, I need to go on short term disability. I don't want to go into details because it is personal, but I do want you and everyone to know it is not life-threatening.

> I don't have a return date at this time. It's best to assume that I will not be able to go to Chicago for the [] compliance audit so I will ask [my admin] to cancel my trip.

> [Customer X] still has not paid what they owe and there are many discussions ongoing around how to handle it. Customer X keeps acting like they will pay any day and then they make excuses for not paying. I did vet the arguments supporting our claims and Nokia's entitlement to full and final payment with [outside counsel] and they agreed on all points and added some of their own. This should not be a situation where we reverse revenue recognition, but we should consider whether a reserve is appropriate because the delays have gone on for far too long. I'll send you an email with the analysis and key points and my recommendation that we escalate within Customer X and advise them of accrued interest. [Attorney Y] with CO L&C has also been involved.

> If anything else arises while I am shutting down, I'll send you an email.

> I do know this is not convenient, but medical issues rarely comply with our schedules or our plans. This one is no exception.

41.     On April 23, 2018 Boudreau officially started Short Term Disability.

42.     On June 20, 2018 Nokia's Chief Legal Officer, Maria Varsellona, awarded Boudreau and her team the Legal & Compliance Excellence Award – May 2018 that stated (emphasis added):

**Dear Legal and Compliance Team Members,**

L&C Excellence Award" is the L&C initiative to recognize the top performing team members who have accomplished extraordinary results.

For May, I would like to recognize **Sharan Boudreau** (GS L&C), **[Contract Manager]** (CO L&C NAM) and **[Attorney Y]** (CO L&C NAM) for their relentless efforts in the [] agreement with [Customer Z]. This game-changer deal, where the L&C team worked with the [] team of Global Services with cross-BG solution and CO NAM [Customer Z] sales colleagues, will see [Customer Z] and Nokia develop, test and launch the next generation of IoT services to meet the needs of a wide range of industries, including transportation, health, manufacturing, retail, agriculture, utilities, consumer electronics and smart cities. The solution is targeted to be available in more than 20 countries across Europe, Asia, North America, South America and the Middle East []. Nokia [] will provide a worldwide IoT infrastructure as a service to [Customer Z], as well as managed services for IoT connectivity across all continents.

Sharan, [CM] and [Attorney Y] did outstanding job in partnering with the business in the extensive negotiations which included several elements of new business models such as "as a service" licensing, revenue share and the [] solution itself. In addition, the negotiations included some challenging customer specific requirements which the [], CO and L&C team carefully managed. Quoting [senior VP] in a monthly business review: 'the way the team dealt some of the trickiest clauses was a playbook example of handling customer negotiations.'

Please join me in congratulating Sharan, [CM] and [Attorney Y] for their achievements!

Best regards,

Maria

43.     On August 24, 2018 Boudreau filed a charge of sex and age discrimination against Nokia with the EEOC and the **Texas Workforce Commission, Civil Rights Division (the "TWC")**.

44.     Nokia fired Boudreau because of her sex and age and in retaliation for investigating and complaining of such discrimination on October 28, 2018 and for filing charges of sex and age discrimination and retaliation against Nokia with the EEOC and the TWC.  Nokia fired Boudreau by letter dated October 31, 2018, telling Boudreau in the letter that her

termination was already in effect – as of October 28, 2018. Nokia's termination letter to Boudreau dated October 31, 2018 stated, "Since you will not be able to return to work by the expiration of your STD benefits, I am notifying you that your employment is terminated on October 28, 2018." Nokia caused the emotional damage to Boudreau that led to her need for Short Term Disability and her inability to return to work by the time her STD benefits expired, so its termination of Boudreau flowed from its sex and age discrimination and unlawful retaliation against Boudreau.

45.     Having worked tirelessly and with a hugely positive impact (as evidenced by review after review after review) for 14 plus years, Boudreau expected to be treated according to her performance and skills, not her gender and age. To her great regret and despite her mind and heart's bafflement at it all, she firmly believes that this devastating experience has permanently disabled her from working.

46.     On April 8, 2019, Boudreau requested a right to sue letter from the EEOC and the TWC. By letter dated April 22, 2019, the EEOC issued Boudreau a right to sue letter with respect to her August 24, 2018 charge. By letter dated May 6, 2019 and received May 9, 2019, the TWC issued Boudreau a right to sue letter with respect to her August 24, 2018 charge. Boudreau has satisfied all jurisdictional prerequisites in connection with the claims pursued in this action.

## III.  CAUSES OF ACTION

**A.     First Cause of Action:   Age Discrimination in Violation of the ADEA and the TCHRA**

47.     Plaintiff re-alleges and incorporates the allegations stated in Paragraphs 1 through 46 as if fully stated herein.

48.     Defendant's actions as described above constitute unlawful discrimination on the basis of age under 29 U.S.C. § 623(a)(1) and Tex. Labor Code §21.001 *et. seq.*

49.     As a result of Defendant's discriminatory policies, practices and actions, Boudreau incurred lost wages and benefits as well as mental anguish for which Plaintiff hereby sues.

50.     Defendant's conduct as described above constitutes a willful violation of the ADEA within the meaning of 29 U.S.C. § 626(b), thus entitling Boudreau to liquidated damages. Defendant's conduct as described above constitutes a malicious violation of the TCHRA, thus entitling Boudreau to punitive damages.

51.     Boudreau is also entitled to reasonable attorneys' fees, expert witness fees, and costs.

**B.      Second Cause of Action:   Sex Discrimination in Violation of Title VII and the TCHRA**

52.     Plaintiff re-alleges and incorporates the allegations stated in Paragraphs 1 through 51 as if fully stated herein.

53.     Defendant's actions as described above constitute unlawful discrimination on the basis of sex in violation of Title VII, 42 U.S.C. Section 2000e *et seq.* and Tex. Labor Code §21.001 *et. seq.*

54.     As a result of Defendant's discriminatory policies, practices and actions, Boudreau incurred lost wages and benefits as well as mental anguish for which Plaintiff hereby sues.

55.     Defendant's conduct as described above constitutes a malicious violation of Title VII and the TCHRA, thus entitling Boudreau to punitive damages.

56.     Boudreau is also entitled to reasonable attorneys' fees, expert witness fees, and costs.

**C.     Third Cause of Action: Retaliation in Violation of the ADEA, the ADA, Title VII, and the TCHRA**

57.     Plaintiff re-alleges and incorporates the allegations stated in Paragraphs 1 through 56 as if fully stated herein.

58.     Defendant's actions, including but not limited to the failure to promote and ultimate termination of Plaintiff, were undertaken because of Plaintiff's protected activity under the ADEA and the TCHRA.   Defendant's actions as described above constitute unlawful retaliation in violation of the ADEA, the ADA, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and Tex. Labor Code §21.001 *et seq.*

59.     As a result of Defendant's discriminatory practices and actions, Boudreau incurred lost wages and benefits as well as mental anguish for which Plaintiff hereby sues.

60.     Defendant's conduct as described above constitutes a malicious violation of Title VII and the TCHRA, thus entitling Boudreau to punitive damages.   Defendant's conduct as described above constitutes a willful violation of the ADEA, entitling Boudreau to recover liquidated damages.

61.     Boudreau is also entitled to reasonable attorneys' fees, expert fees and costs.

### IV.  JURY DEMAND

62.     Plaintiff hereby demands a jury trial on all issues, claims, actions and defenses in this case.

### V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that Defendant be summoned to appear and answer, and that on final trial, judgment be granted against Defendant, awarding Plaintiff the following:

a.     Back pay, including but not limited to lost wage, bonuses, and all employment benefits Boudreau would have received but for her non-promotion and termination by Defendant);

b.     Actual damages including, but not limited to, reputational damage;

c.     Mental anguish and other compensatory damages;

d.     Liquidated damages and punitive damages in the maximum amount allowed by law;

e.     Prejudgment and post-judgment interest, in the maximum amount allowed by law;

f.     Attorneys' fees, expert fees and costs of suit;

g.     Declaratory relief and injunctive relief prohibiting Defendant from engaging in further discriminatory practices;

h.     Such other and further legal and equitable relief to which Plaintiff may be justly entitled.

DATED: July 5, 2019                    Respectfully submitted,

GILLESPIE SANFORD LLP
4925 Greenville Ave., Suite 200
Dallas, Texas 75206
Phone: (214) 800-5111
Fax: (214) 838-0001

By:  */s/ Hal K. Gillespie*
         Hal K. Gillespie
         State Bar No. 07925500

ATTORNEYS FOR PLAINTIFF